IN the MATTER OF the TRUST CREATED BY Harold C.
SPENGLER, under agreement dated August 15, 1959:

Kurt HALLIN, Appellant-Cross-Respondent,

v.

John HALLIN, Trustee, Respondent-Cross-Appellant.

Court of Appeals

*No. 97–3194. Submitted on briefs December 7, 1998.—Decided
May 5, 1999.*

(Also reported in 596 N.W.2d 818.)

Before Snyder, P.J., Brown and Nettesheim, JJ.

SNYDER, P.J. Kurt Hallin appeals from a July 6, 1996 decision and order and a September 4, 1997 final order of the trial court determining the proper distribution of the Harold C. Spengler Education Trust of 1959 (the Spengler Trust), which was established for the education and general welfare of Spengler's five grandchildren. As a beneficiary of the Spengler Trust, Kurt contends that trustee John Hallin, Kurt's father, breached his fiduciary duty by loaning the trust's corpus upon its termination to family trusts created by John and Phyllis, Kurt's mother. Kurt also challenges the burden of proof that the trial court applied in deciding whether a loan agreement existed between Kurt and John and in reviewing the accuracy of John's accounting of the Spengler Trust. John replies that the court properly found no breach of his fiduciary duty and that the court's findings were not "clearly erroneous." In his cross-appeal, John disputes the court's calculation of the final accounting. Upon review, we uphold the trial court's conclusions and affirm its orders.

## BACKGROUND

The Spengler Trust was one of four family trusts created by Kurt's parents and grandparents.[1] According to the trust's terms, the balance was to be "held and

---

[1] The other trusts included the "J&P" and "P&J" trusts, established by John and Phyllis, and the "G&E" trust, estab-

managed by the Trustees until the youngest of [the] grandchildren reaches the age of twenty-one years at which time the balance of the Trust Estate shall be distributed to the youngest grandchild and the Trust closed."

Kurt is the youngest of the five grandchildren, and on March 5, 1976, he turned twenty-one. John was the sole trustee of the Spengler Trust several years prior to and on Kurt's twenty-first birthday. Around the time of Kurt's birthday, John and Phyllis informed him of the trust. They advised him that he could receive the trust corpus in its entirety or, alternatively, he could loan the funds to them to invest in their own trust accounts, the "J & P" and "P & J" trusts, at an annual interest rate of ten percent. John and Phyllis indicated that they would provide him funds from the Spengler Trust loan amount upon his request. Kurt chose to loan his Spengler Trust share to his parents.

In approximately 1989, John requested that Kurt obtain some documents from John and Phyllis' Pewaukee home while they were residing in Florida. While retrieving the materials, Kurt discovered documents pertaining to the four family trusts. He proceeded to remove the documents, which he then photocopied and allegedly returned to his parents' home.

In 1990, Kurt filed petitions seeking accountings of the family trusts. In June 1995, John submitted an accounting of the Spengler Trust. Kurt filed objections to John's accounting and hearings were held. On July 6, 1996, the court issued a decision and order approving the accounting submitted by John, with certain modifi-

---

lished by John's parents. Kurt filed petitions seeking accountings of all four family trusts.

cations, and directed that John pay Kurt the balance of the trust corpus.

Kurt filed a motion for reconsideration on July 26, 1996, challenging the validity of the accounting entries and the method of computation of interest, and contending that John had breached his fiduciary duty as a trustee. On March 13, 1997, the court let stand its July 6, 1996 decision except that it found in Kurt's favor on the issue of the proper method for computing interest. A final order was entered on September 4, 1997. Kurt now appeals.[2]

## KURT'S APPEAL

### A. Burden of Proof

1. Did the trial court apply the appropriate burden of proof as to the Spengler Trust's accounting?

Kurt challenges the trial court's evidentiary findings which were based upon documentary evidence supplied by John and a credibility determination in favor of John. Kurt alleges that the court applied an incorrect standard of proof and improperly placed the burden of proof on Kurt to disprove John's accounting evidence.

---

[2] In his brief-in-chief, John contends that this court lacked jurisdiction to consider Kurt's appeal because it was not timely filed. Additionally, in his brief in support of his cross-appeal, John argues that the trial court's March 13, 1997 decision in response to Kurt's motion for reconsideration was void. Both arguments are conditioned upon the court's July 6, 1996 order having been a final order or judgment under § 808.03(1), STATS. Because this issue was resolved against John by an order of this court dated June 8, 1998, we need not further address these points.

Determining the proper burden of proof is a question of law which we review de novo. *See State v. Higginbotham*, 110 Wis. 2d 393, 402, 329 N.W.2d 250, 255 (Ct. App. 1982). As a fiduciary, a trustee must exercise "diligence, prudence, and absolute fidelity" in managing a trust estate. *Sensenbrenner v. Sensenbrenner*, 76 Wis. 2d 625, 635, 252 N.W.2d 47, 51 (1977) (quoted source omitted). The duty of a trustee to make an accurate accounting is clear:

> [A] trustee has the duty to keep proper accounts of his stewardship. The responsibility and duties of a trustee are not to be lightly assumed or carelessly executed. Good faith in their performance alone is not sufficient. We need not dwell to any extent on the duties to keep clear, distinct, and accurate records of all the transactions of a trustee. . . . The final account of a trustee should show in detail the items expended and show when, to whom, and for what purposes the payments were made so the beneficiaries can make a reasonable test of the accuracy of the accounts.

*Barry v. Richards*, 21 Wis. 2d 334, 341–42, 124 N.W.2d 297, 302 (1963) (citations omitted). If a trustee's accounting is not clear, "all presumptions are against the trustee and all obscurities and doubts are to be taken adversely to him." *Id.* at 342, 124 N.W.2d at 302. In addition, the trustee has the burden of "showing on the accounting how much principal and income he has received and from whom, how much disbursed and to whom, and what is on hand at the time." GEORGE GLEASON BOGERT & GEORGE TAYLOR BOGERT, THE LAW OF TRUSTS & TRUSTEES § 962 (rev. 2d ed. 1983).

The present case is complicated by the fact that John has been unable to locate the Spengler Trust

ledger book and the 1976 fiduciary income tax returns, both of which were maintained by John and would likely be dispositive of the accounting issues. John suggests that Kurt was responsible for these missing documents because he removed Spengler Trust documents from John's Pewaukee residence. In response, Kurt admits that he removed trust documents but claims that he returned them. He maintains that he had not seen either the Spengler Trust ledger or the 1976 tax returns.

In its July 6, 1996 decision, the trial court found that while Kurt, on the one hand, had admitted to taking trust documents from his parents' residence without their permission, John, on the other hand, "had no reason to remove these two critical pieces of information." Although the court did not expressly hold Kurt responsible for the missing documents, it did take Kurt's actions into consideration. In determining the balance of the Spengler Trust, the court found that John was "more credible than Kurt as to [his] recall and recitation of the events that took place between Kurt and his parents nearly 20 years ago" and thus ruled in John's favor.

Kurt asserts that the trial court erred in weighing the credibility of the parties in determining the Spengler Trust accounting. He contends that as the trust's fiduciary, John had a heightened burden of proof in demonstrating the proper accounting and that the court failed to follow such a burden. Although we agree with Kurt that the court did consider the credibility of the parties in making its decision, under the present circumstances we are not persuaded that this was error.

Ordinarily, evidence of a trust accounting must be "clear, distinct and accurate"; if the evidence is not clear, all presumptions will be against the trustee. *See Barry*, 21 Wis. 2d at 341–42, 124 N.W.2d at 302. Additionally, "[i]f the trustee claims that he kept an account book but that he has lost it, . . . he must bear the burden of proving the payments which he alleges were shown by the book, and that doubts will be resolved against him." BOGERT & BOGERT, *supra*, § 962; *see Engelsmann v. Holekamp*, 402 S.W.2d 382, 391 (Mo. 1966). In the present case, because the Spengler Trust ledger and the 1976 income tax returns are missing, John would be required to satisfy a heightened burden in which all doubts would be resolved against him. However, because Kurt, as beneficiary, admittedly removed critical trust documents, we are unwilling to impose a heightened burden upon John's evidence. Therefore, we conclude that the court did not err in weighing the credibility of John's documentation and testimony against Kurt's evidence in determining the trust accounting.

2. Did John meet his burden of proof as to the Spengler Trust accounting?

Whether a party has met its burden of proof is a question of law which this court may examine without giving deference to the trial court's conclusion. *See Burg v. Miniature Precision Components, Inc.*, 107 Wis. 2d 277, 287, 319 N.W.2d 921, 927 (Ct. App. 1982), *rev'd in part on other grounds*, 111 Wis. 2d 1, 330 N.W.2d 192 (1983). However, we must accept the trial court's assessment of the credibility of a witness unless we can

258

say that a witness was credible or incredible as a matter of law. *See id.*; § 805.17(2), STATS.

During the trial court proceedings, John presented three documents as evidence that the Spengler Trust's corpus on the date of Kurt's twenty-first birthday, March 5, 1976, was $67,255.82. First, he produced a 1974 fiduciary income tax return with an attached handwritten document showing that the corpus totaled $64,737.92 on April 15, 1975. Second, he provided a handwritten note prepared in the mid–1980s indicating a "final distribution" to Kurt's older brother Eric in 1973 and a final distribution to Kurt in 1976 of $67,255.82. Third, John offered a January 22, 1990 memorandum he had written to Kurt explaining that the Spengler Trust distribution to Kurt in 1976 was $67,255.82, "which was loaned to the J & P/P & J Trusts with the understanding that it would appreciate @ 10% per annum." This memo noted that John was unable to locate the ledger book specifically created for the Spengler Trust.

Kurt argues that these documents purportedly establishing the Spengler Trust's corpus constitute "secondary evidence," *see Richards v. Barry*, 39 Wis. 2d 437, 442, 159 N.W.2d 660, 662 (1968), which is insufficient to support John's accounting. Kurt also challenges the reliability of John's evidence. He contends that the handwritten note from the mid–1980s was unreliable because John originally testified that the note was prepared contemporaneously with the trust's termination in 1976, but upon cross-examination acknowledged that the stationery on which it was written could not have existed until the mid–1980s. Kurt further contends that the handwritten document accompanying the 1974 tax return was untrustworthy.

 Because the Spengler Trust ledger and the 1976 tax returns were missing, John presented the "secondary" documentation above to establish the trust balance. While the court recognized that John had incorrectly dated one document as being contemporaneous with the trust's termination, the court nonetheless found the document to be credible. In addition, the court found that the memo attached to the 1974 tax return and the 1990 memorandum supported John's accounting. In establishing the amount of the trust to be $67,255.82, the court was further persuaded that John was able "to recall a figure that was the subject of potential litigation with his son." The court's acceptance of John's testimony and documentation was, by and large, based upon a determination that John's evidence was more credible than Kurt's. Because we cannot say that John's evidence was incredible as a matter of law, we are satisfied that John met his burden of proof.

Kurt further asserts that John's accounting included disbursements for which he presented only records of checks drawn from John and Phyllis' personal checking account. Kurt points out that for other disbursements John provided no documentation whatsoever. Kurt contends that John's evidence was insufficient for a trust accounting as a matter of law. Additionally, Kurt argues that John did not meet his burden of proving that certain other disbursements on Kurt's behalf properly came from the Spengler Trust.

Under ordinary circumstances, we would agree with Kurt's contentions that a trustee must present clear and accurate evidence of each disbursement from a trust. However, as we have already determined, this case is unique because the primary record of the Speng-

ler Trust—the trust ledger—is missing. Because the ledger is unavailable and because Kurt admittedly removed trust records, the trial court looked to the evidence it found credible. In this case, such credible evidence included John's testimony as well as personal banking records and other secondary evidence. The court's findings were based upon a credibility determination, and because we cannot say that these findings were incredible as a matter of law, we must affirm the court's determination.[3]

## B. Breach of Fiduciary Duty

Kurt contends that in managing the Spengler Trust, John had a fiduciary duty which extended after Kurt's twenty-first birthday because John recommended to Kurt that the money be loaned to other family trusts that John was managing. In other words, because John was the trustee of the Spengler Trust before its termination and was the trustee of other family trusts that received the Spengler Trust corpus, John's fiduciary relationship with Kurt did not end. Kurt contends that as a fiduciary, John breached his duty by entering into a loan agreement with Kurt in which the Spengler Trust corpus earned ten percent simple interest. While we agree that John had a fiduciary duty in winding up the trust, we conclude that by agreeing to the loan Kurt ratified any misconduct in

[3] Kurt additionally asserts that certain disbursements from the trust on his behalf went towards the purchase of a home, a car and homeowner's insurance but that "evidence clearly showed that these payments were made from the G&E Trust [a separate family trust]." While Kurt cites to John's accounting of the Spengler Trust, we fail to see how the accounting shows that the payments in question were in fact from the G&E Trust.

261

which John may have engaged by borrowing the trust funds for investment in other family trusts.

According to its terms, the Spengler Trust terminated upon distribution of the balance of the estate. Under Wisconsin law, "[t]he same standards to which the trustee is held in the ongoing management of the trust estate must, therefore, apply to the distribution of the trust assets phase of the management of the trust estate." *Sensenbrenner*, 76 Wis. 2d at 635, 252 N.W.2d at 51–52. In addition, we note that

> [a]t such time when the trust is terminated in any way . . . the trust nevertheless continues for a reasonable time during which the trustee has power to perform such acts as are necessary to the winding up of the trust and the distribution of the trust property as are expressly given or reasonably implied from the trust instrument. The trustee has the duty to carry out this phase of the trust administration with reasonable care and prudence.

BOGERT & BOGERT, *supra*, § 1010; *see In re Estate of Townsend*, 198 N.Y.S.2d 868, 870 (N.Y. Sur. Ct. 1960). In the present case, we are convinced that John's fiduciary duties extended beyond the termination of the Spengler Trust until the trust assets were distributed.

Kurt contends that "as soon as [John] proposed to Kurt that the Spengler Education Trust corpus be loaned to the J&P/P&J Trusts," John breached his fiduciary duty. Kurt alleges that John's actions constituted improper "self-dealing" because John stood to gain financially despite his obligations as a fiduciary. We are not persuaded.

We agree with Kurt that at the trust's termination John had a duty to exercise due care and diligence. *See Sensenbrenner*, 76 Wis. 2d at 634, 252 N.W.2d at 51.

We also acknowledge that under certain circumstances a trustee may violate his or her duty of fidelity and due care by proposing to loan the trust corpus to his or her personal account or trust. In this case, we will assume for the sake of argument that John's proposal to Kurt constituted a breach of John's fiduciary duty. Even so, we are not convinced that John would be liable to Kurt because Kurt expressly ratified John's actions by agreeing to loan the Spengler Trust corpus upon the trust's termination.

Principles of trust law recognize that "[a]fter a breach of trust has occurred, a beneficiary may expressly or impliedly express satisfaction with the trustee's action and thereby prevent himself from claiming thereafter that it was illegal." BOGERT & BOGERT, *supra*, § 942; *see Koult v. Kaufer*, 164 Wis. 136, 144, 159 N.W. 806, 809 (1916) (no claim is stated against a trustee where the beneficiary retains a benefit created by trustee, thereby ratifying the wrong); *Mahle v. First Nat'l Bank*, 610 N.E.2d 115, 117 (Ill. Ct. App. 1993) ("[A] trust beneficiary who consents to . . . an act, omission, or transaction by a trustee, may upon the ground of waiver or estoppel, be precluded from subsequently objecting to the impropriety of such act, omission, or transaction."). Ratification by a beneficiary requires proof of (1) an express or implied consent to the trustee's action and (2) "full knowledge of all the material particulars and circumstances." BOGERT & BOGERT, *supra*, § 942 (quoted source omitted); *see In re Estate of Janes*, 630 N.Y.S.2d 472, 477 (N.Y. Sur. Ct. 1995), *aff'd as modified*, 643 N.Y.S.2d 972 (N.Y. App. Div. 1996) ("To establish ratification by a beneficiary it must be shown that the ratification was done with knowledge of material facts.").

Here, Kurt expressly consented to John's actions. In concluding that Kurt had agreed to loan the Spengler Trust's corpus to his parents' trusts, the trial court found that Kurt and his parents had discussions about the trust at the time of Kurt's twenty-first birthday and that "Kurt was well aware of the fact that he could receive a final distribution from the Spengler trust." The court found that an oral agreement had been made in which the balance of the Spengler Trust would be invested in John and Phyllis' family trusts with ten percent simple interest. The agreement permitted Kurt to receive funds from the balance upon his request. This arrangement was similar to a loan agreement made between Kurt's parents and Kurt's brother Eric.

In finding that an agreement existed between Kurt and his parents, the court determined that John's evidence of an agreement was more credible than Kurt's testimony to the contrary. Kurt argues that the trial court applied the wrong standard of proof as to the existence of the loan agreement and that John failed to meet his burden of proof. Kurt also contends that because no written agreement was produced by John and because a written summary of the alleged agreement did not appear until 1990, there was insufficient proof of an agreement as a matter of law.

In establishing the existence of a contract or agreement, John had the burden to prove the elements of a contract: offer, acceptance and consideration. *See NBZ, Inc. v. Pilarski*, 185 Wis. 2d 827, 837, 520 N.W.2d 93, 96 (Ct. App. 1994). Kurt contends that there was never an offer to borrow the trust balance in the first instance; instead, he claims that the loan arrangement was "a unilateral act of John Hallin's which did not come to light until Kurt began making inquiries as to the sta-

tus of his . . . Trust funds." The trial court, however, found Kurt's position incredible and, therefore, ruled that an agreement had in fact been made.

██

As we have previously noted, a trial court's findings of fact will not be set aside unless clearly erroneous, and deference will be accorded the court's findings of credibility. *See* § 805.17(2), STATS. That Kurt and his parents had conversations about a loan agreement at the time of Kurt's twenty-first birthday and discussed the terms of the loan are questions of fact which the trial court must decide. Upon review, we cannot say that these findings were clearly erroneous. We are also satisfied that, based upon the court's findings, the elements of a binding contract were met notwithstanding the failure of John to produce a written agreement. An offer was made to Kurt for his parents to manage his Spengler Trust funds through John and Phyllis' family trusts. This offer was similar to the arrangement that Kurt's brother entered into. Kurt accepted this offer, and consideration was provided in that Kurt earned ten percent annual interest in return for his parents' promise to invest the money while bearing the risk of the investment.

As to the second element of ratification, we must determine whether the beneficiary had "full knowledge of all the material particulars and circumstances." BOGERT & BOGERT, *supra*, § 942. Kurt claims that he did not. He argued to the court, for example, that he believed that he was only entitled to a final distribution from the Spengler Trust upon completion of his master's degree. However, finding that Kurt's testimony was incredible, the court determined that "Kurt was well aware of the fact that he could receive a final distribution from the Spengler Trust at [the time of his

twenty-first birthday] rather than if and when he completed his education sometime in the future." Ultimately, the court ruled that Kurt had knowledge of the terms of the agreement. We cannot say that the court's finding was erroneous as a matter of law. Therefore, because Kurt consented to loan the trust funds to his father with full knowledge of the terms of the agreement, we conclude that Kurt ratified John's actions and thus is barred from maintaining a claim for breach of fiduciary duty.

## JOHN'S CROSS-APPEAL

### A. Waiver

In his cross-appeal, John contends that the court's March 13, 1997 decision modifying the method of calculating the rate of appreciation on the loan from Kurt was invalid because Kurt did not raise this issue until he brought his motion for reconsideration. We disagree.

John submitted an accounting to the court in June 1995. On June 19, 1995, the court entered a scheduling order which required Kurt to file "any objection" that he had with respect to John's accounting and to identify any documents which Kurt believed would support his objection to the accounting. On July 7, 1995, Kurt filed a disclosure of all the Spengler Trust assets in which he claimed an interest; however, he did not include any objections to the accounting at that time. The court permitted Kurt another opportunity to file his objections, and on September 29, 1995, he filed a written objection to the trust accounting, although he did not specifically contest the method of computing the rate of return.

At the court hearings, Kurt disputed that he had agreed to loan the Spengler Trust corpus to his parents to invest in their family trusts. However, he did not contest the method of calculating the rate of return. In its July 6, 1996 decision and order, the court determined that an agreement had been made to loan the trust funds and that the annual rate of return was ten percent. Finally, in his motion for reconsideration filed on July 26, 1996, Kurt for the first time disputed the method of computing the rate of interest on the funds loaned to his parents. Kurt explained that this objection was not made previously because he believed "there were so many other flaws in the Accounting" and because it made more sense to raise the issue once John had been ordered to make a final accounting. In its March 13, 1997 decision, the court permitted Kurt's objections and applied his method of computation. The court noted that it had previously not "specifically address[ed] with clarity how the accounting should actually be computed."

Citing *O'Neill v. Buchanan*, 186 Wis. 2d 229, 519 N.W.2d 750 (Ct. App. 1994), John argues that Kurt was not in a position to raise any new objections to the accounting in his motion for reconsideration. In *O'Neill*, the plaintiff, an interested party of a will, sought reconsideration of a will construction decision where the plaintiff failed to make an appearance at the will construction hearing. We determined that because the plaintiff did not make an appearance, "he did not present any arguments to the court and there was no full adversarial exposition of all of the issues at that time. Therefore, he preserved no issues to appeal from related to the first order." *Id.* at 232, 519 N.W.2d at 751. In addition, we noted that "reconsideration assumes that the question has previously been consid-

ered. If a party has not yet appeared and presented arguments in the litigation, the court has not considered that party's arguments in the first instance." *Id.* at 234, 519 N.W.2d at 752. We concluded that because the plaintiff failed to show excusable neglect, the plaintiff waived his opportunity to contest the will construction.

*O'Neill* is not dispositive of the issue here. Unlike the plaintiff in *O'Neill,* Kurt raised numerous objections to John's accounting prior to his motion for reconsideration. In his September 29, 1995 objection to the Spengler Trust accounting, Kurt "object[ed] to each and every entry in the Accounting" and denied that he had agreed to loan his trust funds to his parents. While Kurt did not specifically contest the method used to calculate the interest on the accounting, in its March 17, 1997 decision, the court permitted his objection, noting that it had not previously addressed how the accounting would be computed.

Waiver is not a jurisdictional defect but a rule of administrative convenience. *See Terpstra v. Soiltest, Inc.,* 63 Wis. 2d 585, 593, 218 N.W.2d 129, 133 (1974). In the present case, we do not believe that Kurt waived his objection to the method of accounting simply because he did not specifically make this objection until after the court's July 6, 1996 decision and order. Since Kurt had maintained that there was no agreement in the first instance, the issue was properly raised in the motion for reconsideration which followed the court's determination that an agreement had in fact been made. In its March 17, 1997 decision, the trial court could have concluded that the issue was waived, but, as the court explained, it had not expressly addressed the proper method of computing the final accounting. We

are convinced that in addressing the proper method of computing the accounting balance, the court appropriately considered an issue that was not adequately dealt with in its July 6, 1996 decision and order.

## B. Accounting Credit

Finally, John asserts that the trial court erred in allowing John a credit of $21,001 for Kurt's purchase of his parents' cottage in Lake Mills, Wisconsin, from the date of the court's July 6, 1996 decision rather than from the date of the court's October 9, 1991 stipulation and order issued at the time of the sale of the cottage. John first contends that Kurt waived his objection to this issue because Kurt did not raise it in writing until after the court's July 6, 1996 decision. However, as Kurt points out, his September 29, 1995 objection to the Spengler Trust accounting specifically stated the following:

> Kurt Hallin also objects to the following entries in the Accounting:
>
> . . . .
>
> 11. The final entry is objectionable in that it misstates the agreement of the parties in a stipulation dated October 1, 1991 that was marked as Exhibit 20 at the hearing on September 27, 1995.

The "final entry" of the accounting was the purchase of the Lake Mills cottage, for which the "amount repaid" was $20,000.[4] Therefore, John's first contention has no merit because Kurt had, in fact, raised this accounting issue before the trial court's July 6, 1996 decision and order.

---

[4] John admits that this amount should in fact have been $21,001.

Next, John argues that the trial court misconstrued the parties' stipulation as to when the payment for the cottage would be credited against John's obligation to pay Kurt. John asserts that the credit was to be effective as of the October 1, 1991 stipulation.[5] His position, however, is belied by the stipulation itself, which states that the "credit shall be applied by the court at such time as the court ultimately determines what obligation, if any, is owing by the trusts to Kurt Hallin." In its July 6, 1996 decision, the court specifically found that "pursuant to the October 1, 1991 stipulation and order, a $21,001 credit shall be applied to the trusts as of the date of this decision." In its March 17, 1997 decision, the court restated that the credit would be applied as of the date of the July 6, 1996 decision. In fact, at the March 17, 1997 hearing, John's counsel expressly requested that John receive the credit as of the July 6, 1996 decision: "[F]rankly, Your Honor, I think we should get the credit as of the time you made your decision last July."

Because John is now asserting that the credit should have been taken at the time of the October 1, 1991 stipulation, he is taking a position contrary to the one he argued and on which he ultimately prevailed at the trial level. The doctrine of judicial estoppel precludes John from maintaining his current position.

In considering the requirements for judicial estoppel, we first note that John's latter position is clearly inconsistent with his earlier position. *See State v. Petty*, 201 Wis. 2d 337, 348, 548 N.W.2d 817, 821 (1996). Second, the facts at issue are identical to the facts at

---

[5] While John makes reference to October 9, 1991, and "the agreement of October 9, 1991," we read his argument as addressing the October 1, 1991 stipulation.

the time of the court's March 17, 1997 oral decision. *See id.* Third, the court adopted John's position at the March 17, 1997 hearing. *See id.* Thus, we are satisfied that the elements of judicial estoppel are met, thereby precluding John from asserting his present position that a $21,001 credit should be taken as of October 1, 1991.[6]

For the foregoing reasons, we affirm the orders of the trial court.

*By the Court.*—Orders affirmed.

---

[6] Because John is judicially estopped from maintaining his current position as to the date of the payment credit, we decline to address his claim that he was "effectively deprived of the opportunity to testify as to his understanding of the agreement of October 9, 1991."